1  BENJAMIN E. SHIFTAN, SBN 265767
(bshiftan@pwfirm.com)
2  **PEARSON WARSHAW, LLP**
555 Montgomery St., Suite 1205
3  San Francisco, CA 94111
Telephone: (415) 433-9000
4

5  *Attorneys for Plaintiffs and the Putative Classes*

6  [Additional counsel listed on signature page]

7  **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
8

9  BRITTANY BOUNTHON, VIVIANNA           CASE NO.
RIVERA and GINA ALLEN, individually and
10  on behalf of all others similarly situated,

11                                       **CLASS ACTION COMPLAINT**
             Plaintiffs,
12                                       **DEMAND FOR JURY TRIAL**

13      v.

14  THE PROCTER & GAMBLE COMPANY,

15             Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

Plaintiffs Brittany Bounthon, Vivianna Rivera, and Gina Allen, individually, and on behalf of all others similarly situated ("Plaintiffs"), bring this Class Action Complaint against Defendant The Procter & Gamble Company ("P&G" or "Defendant") and allege the following based on personal knowledge as to themselves, and as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE CASE

1.      This is a civil class action brought by Plaintiffs on behalf of consumers who purchased Tampax-branded Pure Cotton tampons (the "Tampon Products" or the "Products") for personal hygiene purposes.

2.      Approximately 5.8 billion tampons were sold in the United States in 2018.[1] In 2020 alone, 34.1 million women in the United States used tampons to manage their menstruation.[2]

3.      In recent years there has been increased concern from women about the presence of chemicals in menstrual products and how these chemicals might affect long-term health.[3] These concerns arise, in part, from the fact that the vagina and vulva absorb chemicals at a higher rate than other areas of the body.[4] Accordingly, consumers have begun to demand eco-friendly, natural, and chemical-free methods of managing menstruation.

4.      As one of the biggest players in the very lucrative feminine hygiene market, P&G is keenly aware of increased consumer demand for products which limit unnecessary chemical exposure. In order to capitalize on this demand, P&G designs, manufactures, advertises, distributes, and sells personal care products, including the Tampon Products that are the subject

---

[1] https://www.nationalgeographic.com/environment/article/how-tampons-pads-became-unsustainable-story-of-plastic (last accessed February 20, 2023).

[2] https://www.statista.com/statistics/278085/us-households-usage-of-tampons/ (last accessed February 20, 2023).

[3] *See* https://www.theguardian.com/commentisfree/2015/apr/20/tampon-safety-research-legislation (last accessed Feb. 20, 2023).

[4] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3948026/ (last accessed Feb. 20, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

1  of this action.

2      5.      Beginning with the name "Tampax Pure Cotton," along with the "100% ORGANIC

3  Cotton Core" representation, both of which are in large, bold font on the front and center of the

4  Tampon Products, Defendant intentionally and knowingly leads consumers to believe that the

5  Tampon Products are a healthy product for absorbing menstrual fluid, and that they do not

6  contain any chemicals that are potentially harmful to women's health[5]:

7

8

9

10



11

12

13

14

15

16

17

18

19      6.      Similarly, on the back label of the Tampon Products, P&G uniformly represents the

20  Tampon Products as being "THE BEST OF SCIENCE & NATURE" in capitalized font, and

21  reaffirms that the products contain "100% ORGANIC" cotton[6]:

22

23

24

25

26  [5] https://tampax.com/en-us/all-products/pure-cotton/pure-cotton-regular/ (last accessed Feb. 21,
    2023).
27

28  [6] https://www.safeway.com/shop/product-details.970308201.html (last accessed Feb. 21, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104



7.      Defendant has intentionally designed the front and back label representations on the Tampon Products, beginning with the name "Tampax Pure Cotton," along with the "100% ORGANIC" representations, as well as the "THE BEST OF SCIENCE AND NATURE" representation (collectively, the "Pure and Organic Representations"), in order to lead reasonable consumers to believe that the Tampon Products do not contain any potentially harmful chemicals.

8.      Reasonable consumers, therefore, fairly and reasonably understand that a product marketed with the Pure and Organic Representations would not contain chemicals known to be harmful to humans or the environment.

9.      P&G knows that consumers are concerned with the ingredients in their personal care products, especially products like tampons that are designed to be used internally. Thus, P&G has intentionally utilized its marketing, centering on the Pure and Organic Representations, to drive sales and increase profits, including by targeting health-conscious consumers who reasonably believe that the Products are free from harmful chemicals.

10.     However, despite P&G's consistent and pervasive marketing of the Products as Pure and Organic, Plaintiffs' independent testing has shown that the Tampon Products contain per- and polyfluoroalkyl substances ("PFAS"), a category of human-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

11.     The presence of PFAS chemicals in the Tampon Products is entirely inconsistent with P&G's uniform Pure and Organic Representations.

12.     As a result of P&G's misconduct, Plaintiffs and members of the putative classes, as defined below, have suffered injury in fact in the form of economic damages.

13.     Plaintiffs bring this suit to halt P&G's dissemination of false and misleading representations and to correct the false and misleading perceptions that P&G's representations have created in the minds of reasonable consumers.

14.     Plaintiffs seek damages, injunctive relief, and other equitable remedies for themselves and for the proposed classes.

**JURISDICTION**

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more proposed Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Defendant because Defendant has intentionally availed itself of the laws of the United States and the state of California, having purposefully marketed, advertised and/or sold the Products to consumers across the United States, including the state of California. Such conduct has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in the state of California.

**VENUE**

17.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendant transacts business in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

4

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

**DIVISIONAL ASSIGNMENT**

18.     Plaintiff Brittany Bounthon purchased the Tampon Products in Dublin, California, Emeryville, California, and San Francisco, California. Accordingly, pursuant to Civil Local Rule 3-2(d), this action can be assigned to the Oakland Division or San Francisco Division.

**PARTIES**

19.     Plaintiff Brittany Bounthon is a citizen of the state of California and resides in San Leandro, California.

20.     Plaintiff Vivianna Rivera is a citizen of the state of California and resides in Fontana, California.

21.     Plaintiff Gina Allen is a citizen of the state of California and resides in Sun City, California.

22.     Defendant The Proctor & Gamble Company is a Delaware corporation with its principal place of business located in Cincinnati, Ohio.

**FACTUAL ALLEGATIONS**

23.     Tampons are a method of absorbing menstrual flow that are worn internally by inserting them into the vagina.[7]

24.     In the 1930s, the first tampons were sold to consumers under the brand name "Tampax."[8]

25.     Since introducing the first commercial tampon, the Tampax brand has continued to dominate the feminine hygiene market with a 29% global market share. In fact, in 2019 alone, 4.5 billion boxes of Tampax tampons were sold worldwide.[9]

26.     Thus, Tampax is indisputably one of the most well recognized—and highly trusted—

---

[7] https://www.fda.gov/consumers/consumer-updates/facts-tampons-and-how-use-them-safely (last accessed Feb. 20, 2023).

[8] https://www.theatlantic.com/health/archive/2015/06/history-of-the-tampon/394334/ (last accessed Feb. 2, 2023).

[9] https://www.theguardian.com/society/2020/feb/11/tampon-wars-the-battle-to-overthrow-the-tampax-empire (last accessed Feb. 20, 2023).

brands of feminine hygiene products currently on the market.

27.    In 1997, P&G—a consumer goods corporation specializing in personal care products—purchased Tampax.[10] P&G continues to design, manufacture, market, and sell tampons under the Tampax brand name.

28.    Despite their widespread use, health concerns about feminine hygiene products date back to the 1980s, when tampons were first linked to toxic shock syndrome, a potentially life-threatening condition.[11] From the time toxic shock syndrome was first linked to tampons, and continuing to the present time, Tampax has continuously worked to reassure consumers about the safety of its products.

29.    Currently, there is significant public health concern about the chemicals used in feminine hygiene products.[12] Potential negative health effects stemming from the chemicals in tampons and pads, in addition to environmental concerns related to single-use plastics, have caused many women to seek out alternative menstrual hygiene products, including those that limit their exposure to unnecessary and potentially harmful chemicals and reduce plastic waste. In the past decade, in response to this consumer demand, various new brands have begun to offer menstrual products which are marketed as more ethical and ecologically friendly than traditional feminine hygiene brands like Tampax.[13]

30.    As an undisputed leader in the menstrual products market, Tampax is well aware that consumers are looking for eco-friendly and safe ways to deal with menstruation.[14] Tampax's

---

[10] https://en.wikipedia.org/wiki/Tampax (last accessed Feb. 20, 2023).

[11] https://my.clevelandclinic.org/health/diseases/15437-toxic-shock-syndrome (last accessed Feb. 20, 2023).

[12] https://www.womensvoices.org/2018/06/05/new-tampon-testing-reveals-undisclosed-carcinogens-and-reproductive-toxins/ (last accessed Feb. 20, 2023).

[13] https://www.theguardian.com/society/2020/feb/11/tampon-wars-the-battle-to-overthrow-the-tampax-empire (last accessed Feb. 20, 2023).

[14] https://www.cnn.com/2019/05/21/business/tampon-organic-tampax-pure (last accessed Feb. 20, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

ongoing strategy to capture a share of the natural menstrual care market is apparent from a 2019 statement by Tampax executive Amy Krajewski, who recognized: "[I]t was clear that there was still a big unmet need in the natural menstrual category—an option that worked well."[15]

31.     In an effort to keep up with its new competitors and respond to changing consumer preferences, Tampax introduced its first organic tampon in 2019—the Tampax Pure Cotton.[16]

32.     Tampax's pervasive marketing of the Pure Cotton Tampons as a safe, natural choice for feminine hygiene is summarized in its May 21, 2019 press release, which introduced the Tampon Products to consumers with the following representations:

a.  "No Compromise—PURE offers people the ingredients they want with the trusted protection they expect from Tampax…"

b.  "Afraid that natural products will disappoint? Not anymore."

c.  "Users can feel good about the ingredients, and trust that our product works."

d.  "PURE was created to make sure people have the choices they want when it comes to period protection."

e.  "simple ingredients"[17]

33.     P&G currently sells Tampax tampons, including the Pure Cotton Tampons, in retail stores throughout the country, including at drug and grocery stores such as Walgreens, CVS, Target, Kroger, and Walmart.

***Defendant's False and Deceptive Advertising***

34.     As discussed above, P&G uniformly represents the Tampon Products with the Pure and Organic Representations that confirm for the reasonable consumer that they are free

---

[15] https://www.businesswire.com/news/home/20190521005496/en/Tampax-PURE---The-Organic-Tampon-Youve-Been-Waiting-For (last accessed Feb. 20, 2023).

[16] https://www.cnn.com/2019/05/21/business/tampon-organic-tampax-pure (last accessed Feb. 20, 2023).

[17] https://www.businesswire.com/news/home/20190521005496/en/Tampax-PURE---The-Organic-Tampon-Youve-Been-Waiting-For (last accessed Feb. 21, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

1  from artificial ingredients such as PFAS.

2      35.    The Pure and Organic representations appear prominently on the Products' front

3  label, which is adorned with illustrations of cotton plants to underscore the Pure and Organic

4  nature of the Products[18]:



19      36.    Likewise, the Tampon Products' back label[19] contains the Pure and Organic

20  representations, which are further bolstered by the inclusion of the phrase, "The Best of Science &

21  Nature," along with representations that the Tampon Products are made with high-quality organic

22  and plant-based ingredients:

---

26  [18] https://tampax.com/en-us/all-products/pure-cotton/pure-cotton-regular/ (last accessed Feb. 21,
27  2023).

28  [19] https://www.safeway.com/shop/product-details.970308201.html (last accessed Feb. 21, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104



37. The packaging's side panel contains similar representations, along with the Products' ingredients, which are listed as: cotton, polypropylene, polyester, glycerin, paraffin, and titanium dioxide. Nowhere on the Products' packaging does P&G disclose the presence of PFAS.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

38.     In fact, P&G uses its official website and social media channels to uniformly reassure consumers that it "relentlessly pursue[s] the best ingredients that can be used safely from both science and nature"[20]:

# Nothing but the best ingredients



At Tampax, we believe your vagina deserves the best. We relentlessly pursue the best ingredients that can be used safely from both science and nature, and we continuously assess every finished product to ensure safety. For example, rayon is a synthetic material derived from purified wood pulp and is processed into an absorbent cellulose fiber. Its unique fiber shape (trilobal rayon) is specifically designed for tampons. It absorbs fluid quickly and expands to help stop leaks. Natural cotton is an ideal absorbent fiber that provides the period protection we all need. Some tampons use a combination of natural cotton and rayon fibers that help provide the ideal absorbency level for your flow.

39.     Even further, P&G promises that the Products contain "only the ingredients you need."[21]

# Purposeful design, intentional ingredients

Our products are designed to give you the comfort and protection you want with only the ingredients you need.

40.     P&G corroborates its Pure and Organic Representations on its website, where it

---

[20] https://tampax.com/en-us/about/ingredients/what-tampons-are-made-of/ (last accessed Feb. 21, 2023).

[21] *Id.*

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

explains how the cotton used in the Tampon Products is purified[22]:

## Cotton is Purified

Tampax Pure Cotton is processed free from elemental chlorine and free from chlorine dioxide. The cotton used in Tampax tampons is purified using a Totally Chlorine Free (TCF) process.

The purification process also removes:

- The natural waxes & oils, so cotton is more absorbent
- Natural colorants and contaminants, so cotton is purified

41.     P&G specifically states that the cotton used in the Tampon Products is purified to remove contaminants, leading reasonable consumers to conclude that extra care has been taken to remove any harmful ingredients.

42.     P&G also represents to consumers that the Products are thoroughly tested and evaluated before reaching consumers, including by independent certification, to ensure that the Products do not contain harmful chemicals[23]:

## Cotton is Tested

Quality and safety are at the heart of everything we do, and our products are thoroughly evaluated before they reach consumers. We follow a rigorous 4-step safety process to ensure that our products do not contain harmful chemicals and test our products for skin sensitivity.

The cotton in our Tampax products have been certified by the independent label OEKO-TEX® Standard 100 since 2018, which tests for the presence of hundreds of substances for their safe use in period products.

Tampax Pure Cotton tampons contain 100% organic cotton core. The OCS100 Standard credential certifies that the absorbent core is 100% organic cotton, validating the integrity and quality of our organic fibers.

---

[22] https://tampax.com/en-us/all-products/pure-cotton/ (last accessed Feb. 21, 2023).

[23] Id.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

43.     Because P&G knows that safety is material to consumers—especially when using a product that is designed to be used internally in the body—the Tampax website even outlines the specific details of its 4-step safety process for creating the Products[24]:

# 4 Step Safety Process

At Tampax, the safety of our ingredients and materials is the most important choice we make for our products.



**DOUBT**
The Foundation

When we explore ingredient options or work with our suppliers, we ask questions, just like you. We review all existing safety information and if we can't be sure that it can be used safely, we won't use it.



**DEFINE**
Safe Range

Our PhD scientists and outside experts help us define a safe level for each ingredient. Almost everything in the world has a safe and an unsafe level or limit, including life-sustaining basics like sunlight, oxygen and water.



**DETERMINE**
Safe Product Use

We rely on analytical data in combination with supplier information to ensure that the amount of an ingredient is within the safe limits.



**DILIGENCE**
Monitor Use and New Information

Perspective on an ingredient's safety can change, sometimes seemingly overnight. That's why we review new literature, assess consumer comments and connect with experts to stay on top of the science.

---

[24] https://tampax.com/en-us/about/ingredients/ingredient-safety/ (last accessed Feb. 21, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

44.     P&G has even utilized Tampax's official YouTube channel to post videos reassuring consumers about the integrity of the Products' ingredients, including with the promise, "If we can't be assured [an ingredient] can be used safely, then we kick that ingredient to the curb."[25]



45.     P&G has consistently positioned the Tampax brand as a safe, trusted brand, stating, "At Tampax, the safety of our ingredients and materials is the most important choice we make for our products."[26]

46.     Thus, there can be no doubt that the Pure and Organic Representations are intentionally designed to convince reasonable consumers that the Products are, in fact, "pure" and otherwise free from potentially harmful ingredients.

47.     The Pure and Organic Representations are central to P&G's marketing and sale of the Products and are strategically employed to convince health-conscious consumers that the Products are a pure and natural choice.

---

[25] https://youtu.be/52gISZb6m4g (last accessed Feb. 21, 2023)

[26] https://tampax.com/en-us/about/ingredients/ingredient-safety/ (last accessed Feb. 20, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

***PFAS and Associated Risks***

48.     PFAS are a category of highly persistent and potentially harmful man-made chemicals.[27]

49.     PFAS are not naturally occurring.[28] They are-man made and have been used in various products since the 1940s.[29] Thus, they are indisputably synthetic chemicals.

50.     To date, scientists have identified at least 12,000 types of PFAS chemicals.[30]

51.     While there are thousands of varieties of PFAS chemicals in existence, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in the environment and in human bodies.[31]

52.     PFAS chemicals are sometimes called "forever chemicals."

53.     Humans can be exposed to PFAS through a variety of ways, including skin absorption.[32]

54.     PFAS chemicals have been associated with a variety of negative health effects for humans and the environment. The health risks associated with PFAS include, but are not limited to, decreased male and female fertility, negative developmental effects or delays in children, increased risk of cancers, liver damage, and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.[33]

---

[27] https://www.epa.gov/pfas/pfas-explained (last accessed Feb. 20, 2023).

[28] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (last accessed Feb. 20, 2023).

[29] https://www.atsdr.cdc.gov/pfas/health-effects/index.html(last accessed Feb. 20, 2023).

[30] https://comptox.epa.gov/dashboard/chemical-lists/pfasmaster (last accessed Feb. 20, 2023).

[31] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last accessed February 20, 2023).

[32] *Id.*

[33] *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last accessed February 20, 2023); https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed Feb. 20, 2023); https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (last accessed Feb. 20, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

55.     It is well documented that PFAS in personal care products may pose a risk to human health through direct and indirect exposure, as well as a risk to ecosystem health throughout the lifecycle of these products.[34]

56.     As skin is the body's largest organ,[35] subjecting it to absorption of PFAS through tampons is very concerning.

57.     A large number of studies have examined the potential harmful health effects of exposure to PFAS. In a 2019 study, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS has adverse effects on human organ systems, including impacting the liver and thyroid hormone.[36]

58.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[37]



---

[34] https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240 (last accessed Feb. 21, 2023).

[35] https://doi.org/10.3109/17453054.2010.525439 (last accessed Feb. 20, 2023).

[36] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last accessed Feb. 20, 2023).

[37] https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last accessed Feb. 21, 2023).

59.     The EEA has further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[38]

60.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may also impact the immune system and reduce antibody responses to vaccines.[39]

61.     On September 20, 2020, a New York Times article titled "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies" reported on the dangers of PFAS—particularly during gestation and in early childhood development:[40]

> Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> More disturbing, PFAS can also alter levels of both mothers' and babies' thyroid hormones, which oversee brain development, growth and metabolism, and also play a role in immunity. Prenatal PFAS exposures that disrupt metabolism and immunity may cause immediate and lasting effects on both mother and child. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, a type of high blood pressure. Their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face increased risk of childhood obesity and infections.

62.     Costs to society arising from PFAS exposure are high, with the annual health-related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers, 2019).[41] The study notes that these costs are likely underestimated, as only a limited range

---

[38] *Id.*

[39] https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last accessed Feb. 20, 2023).

[40] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (last accessed Feb. 20, 2023).

[41] https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last accessed Feb. 21, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.[42]

63.    There is no treatment to remove PFAS from the body. Due to its bioaccumulative nature, experts agree the most effective strategy to decrease risk is to avoid and/or limit exposure to products known to contain PFAS. As noted by the EPA: "Because certain PFAS are known to cause risks to human health, [one of] the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by . . . taking [steps to] reduce possible exposure during daily activities."[43]

64.    The exposure to toxic substances such as PFAS through period care products is particularly serious due to the fact that studies have shown that the vaginal ecosystem is more sensitive and absorbent than typical skin.[44]

65.    Further, "[r]esearch on vaginal drug delivery has shown that the vaginal canal offers a suitable environment for chemical absorption and circulation. The canal is rich in arteries and lymphatic vessels. And vaginal mucus is sticky, so it holds some molecules against the vaginal wall for a long time; this forced proximity can stimulate absorption."[45]

66.    "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended actions in order to mitigate future harm, including: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[46]

---

[42] *Id.*

[43] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (last accessed Feb. 20, 2023).

[44] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3948026// (last accessed Feb. 21, 2023).

[45] https://undark.org/2022/11/15/in-turmoil-over-tampons-scientists-see-a-need-for-more-scrutiny/ (last accessed Feb. 20, 2023).

[46] https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (last accessed Feb. 20,

*Plaintiffs' Independent Testing Confirms the Presence of PFAS Chemicals in the Products*

67.    Plaintiffs sought independent third-party testing to determine whether the Products contain PFAS chemicals.

68.    Plaintiffs' independent testing was conducted in accordance with accepted industry standards for detecting whether the Products contain organic fluorine, which is a surrogate for PFAS chemicals.

69.    There are more than 12,000 PFAS chemicals currently in existence.[47] Accordingly, it is impractical, if not impossible, for scientists and researchers to test for the presence of each of these 12,000 chemicals in any particular sample.

70.    The presence of organic fluorine in a sample, however, indicates the sample contains PFAS, and is therefore a widely accepted method of determining whether a sample contains PFAS.

71.    Here, Plaintiffs' testing detected the presence of organic fluorine in the Products.

*Defendant's Unlawful Conduct*

72.    P&G is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Products are a "pure" and natural alternative to traditional menstrual products that are free from potentially harmful ingredients like PFAS.

73.    P&G has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Products are superior to other tampons or menstrual products that do not have the same purported natural, pure, or chemical-free health benefits.

74.    Reasonable consumers purchasing the Products would believe, based on P&G's representations, that the Products do not contain artificial, synthetic or man-made chemicals that could adversely impact their health.

75.    At all times relevant to this action, Defendant knew, or at minimum should have

_____

2023).

[47] https://comptox.epa.gov/dashboard/chemical-lists/pfasmaster (last accessed Feb. 20, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

known, that its Products contains PFAS.

76.     Throughout the class period, Defendant has targeted health-conscious consumers by falsely and misleadingly representing its Tampon Products using the Pure and Organic Representations, and consequently, reasonable consumers believe the Tampon Products are free from harmful chemicals such as PFAS.

77.     Defendant is well-aware that consumers are increasingly demanding menstrual products that are free from ingredients that may be harmful to their health and that otherwise support their wellness goals—specifically, harmful chemicals. In its own words[48]:

> Quality and safety is at the heart of everything we do, so all of our products are thoroughly evaluated before they get on the shelves and into your vagina.

78.     Over the course of nearly a century, Tampax has cultivated a trustworthy brand image, including by touting its bona fides as the "the #1 recommended tampon by U.S. Gynecologists."[49]

79.      A recent study found that 61% of respondents would prefer to use menstrual products made by companies that prioritize environmental sustainability and care.[50]

80.     Therefore, current research demonstrates, and Defendant's marketing strategy supports, that the presence of harmful chemicals in menstrual products is material to reasonable consumers.

81.     Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell "pure" tampons which do not contain ingredients that are suspected to cause harm to human health and the environment, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Products.

---

[48] tampax.com/en-us/about/ingredients/what-tampons-are-made-of/ (last visited Feb. 20, 2023).

[49] https://tampax.com/en-us/about/ingredients/what-tampons-are-made-of/ (last accessed Feb. 20, 2023).

[50] https://studyfinds.org/eco-friendly-women-wish-tampons-better-for-environment/ (last accessed Feb. 20, 2023).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

82.     Further, Defendant's claims touting its Product as safe, pure, organic, plant-based and other representations and omissions as described herein, further contribute to the reasonable consumer perception and belief that the Products contain only ingredients that are good for humans and the environment, and that they are free of man-made chemicals indisputably linked to negative health effects.

83.     Consumers lack the expertise to ascertain the true ingredients in the Products prior to purchase. Accordingly, reasonable consumers must, and do, rely on Defendant to accurately and honestly advertise its Products' ingredients and benefits. Further, consumers rely on Defendant to not contradict those representations by using artificial man-made chemicals in its Products that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

84.     Defendant's representations that the Products are healthy for humans and the environment, including *inter alia*, the representations described herein, are false because products containing toxic, man-made ingredients like PFAS are neither good for consumers nor the environment.

85.     Defendant's representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiffs and Class Members, regarding the presence of PFAS chemicals in its Products. Accordingly, these acts and practices by Defendant are deceptive.

86.     Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Products would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

87.     Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Products worthless or less valuable.

88.     If Defendant had disclosed to Plaintiffs and Class Members that its Products contained PFAS chemicals, Plaintiffs and Class Members would not have purchased Defendant's Products, or they would have paid less for them.

89.     Plaintiffs and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

20

CLASS ACTION COMPLAINT

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

90.     Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

91.     The materiality of the representations and omissions described herein also establishes causation between Defendant's conduct and the injuries Plaintiffs and the Class Members sustained.

92.     Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Products using the Pure and Organic Representations and other representations described herein in order to profit off of unsuspecting consumers, including Plaintiffs and Class Members.

93.     The presence of PFAS chemicals in Defendant's Products is entirely inconsistent with its uniform representations.

94.     Defendant's knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Products are "pure" and therefore do not contain artificial, man-made, toxic chemicals. No reasonable consumer would consider Defendant's Products "pure," or good for people and the environment, if she knew that the Products contained harmful, artificial PFAS chemicals.

95.     Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiffs and Class Members.

96.     In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for the Products over comparable products that are made from or contain synthetic or artificial chemical ingredients that are known to be harmful to humans and the environment.

97.     Plaintiffs and Class Members all paid money for the Tampon Products. However, they did not obtain the full value of the advertised Products due to Defendant's misrepresentations as detailed herein. Plaintiffs and Class Members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' artificial, man-made, and harmful ingredients. Thus, Plaintiffs and Class Members have suffered injury in fact and

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

1   lost money or property as a result of Defendant's wrongful conduct.

2   98.   Defendant's widespread marketing campaign portraying the Products as containing

3   healthy ingredients as detailed herein, is misleading and deceptive to consumers because the

4   Products are made with artificial, man-made, and toxic ingredients. Plaintiffs bring this action on

5   behalf of the proposed Classes to stop Defendant's misleading practices.

6   **PLAINTIFF'S FACTS**

7   *Plaintiff Brittany Bounthon*

8   99.   Plaintiff Brittany Bounthon purchased the Tampon Products at various times

9   recently, including in May 2022 from Target in Dublin, California, in June 2022 from Target in

10   Emeryville, California, and in January 2023 from Target in San Francisco, California.

11   100.   At the time she purchased the Tampon Products, Plaintiff Bounthon was specifically

12   seeking out chemical-free personal care products, including chemical-free feminine hygiene

13   products.

14   101.   Prior to her purchase, Plaintiff Bounthon reviewed the Products' labeling, packaging,

15   and marketing materials, including the Pure and Organic Representations on the Tampon Products'

16   label.

17   102.   Plaintiff Bounthon reasonably understood Defendant's Pure and Organic

18   Representations to mean that the Tampon Products would not contain harmful chemicals, especially

19   chemicals that could pose a risk to her health and the environment, like PFAS.

20   103.   Plaintiff Bounthon relied on these representations when purchasing the Products, and

21   these representations were part of the basis of the bargain in that she would not have purchased the

22   Products or would not have purchased them on the same terms, if the true facts had been known.

23   104.   Plaintiff Bounthon continues to seek out menstrual products that are free from

24   harmful chemicals like PFAS, and she would like to purchase Defendant's products in the future if

25   they conform with Defendant's representations about the Products. However, Plaintiff Bounthon is

26   currently unable to rely on Defendant's representations regarding its Products in deciding whether

27   to purchase them in the future. Plaintiff Bounthon understands that the composition of the Products

28   may change over time, but as long as Defendant may freely advertise the Products with the Pure and

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

1   Organic Representations when it contains PFAS, Plaintiff Bounthon will be unable to make

2   informed decisions about whether to purchase Defendant's Products and will be unable to evaluate

3   the different prices between Defendant's Products and competitors' products, which *are* in fact free

4   from harmful chemicals like PFAS.

5        105.    As a direct and proximate result of Defendant's acts, including its affirmative

6   misrepresentations, false statements and material omissions, Plaintiff Bounthon has incurred

7   economic injuries including financial damages at the point-of-sale stemming from her purchase of

8   and/or overpayment for the Products, in addition to the loss of the benefit of her bargain and the

9   products' intended benefits.

10   ***Plaintiff Vivianna Rivera***

11        106.    Plaintiff Vivianna Rivera purchased the Tampon Products most recently in

12   November of 2022, from Walmart in Fontana, California.

13        107.    At the time she purchased the Tampon Products, Plaintiff Rivera was specifically

14   seeking out chemical-free personal care products, including chemical-free feminine hygiene

15   products.

16        108.    Prior to her purchase, Plaintiff Rivera reviewed the Products' labeling, packaging,

17   and marketing materials, including the Pure and Organic Representations on the Tampon Products'

18   label.

19        109.    Plaintiff Rivera reasonably understood Defendant's Pure and Organic

20   Representations to mean that the Tampon Products would not contain harmful chemicals, especially

21   chemicals that could pose a risk to her health and the environment, like PFAS.

22        110.    Plaintiff Rivera relied on these representations when purchasing the Products, and

23   these representations were part of the basis of the bargain in that she would not have purchased the

24   Products, or would not have purchased them on the same terms, if the true facts had been known.

25        111.    Plaintiff Rivera continues to seek out natural menstrual products that are free from

26   harmful chemicals like PFAS, and she would like to purchase Defendant's products in the future if

27   they conform with Defendant's representations about the Products. However, Plaintiff Rivera is

28   currently unable to rely on Defendant's representations regarding its Products in deciding whether

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

to purchase them in the future. Plaintiff Rivera understands that the composition of the Products may change over time, but as long as Defendant may freely advertise the Products with the Pure and Organic Representations when it contains PFAS, Plaintiff Rivera will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitors' products, which *are* in fact free from harmful chemicals like PFAS.

112.    As a direct and proximate result of Defendant's acts, including its affirmative misrepresentations, false statements and material omissions, Plaintiff Rivera has incurred economic injuries including financial damages at the point-of-sale stemming from her purchase of and/or overpayment for the Products, in addition to the loss of the benefit of her bargain and the products' intended benefits.

***Plaintiff Gina Allen***

113.    Plaintiff Gina Allen purchased the Tampon Products from February to April, 2022 from Target and Walmart in Sun City, California.

114.    At the time she purchased the Tampon Products, Plaintiff Allen was specifically seeking out chemical-free personal care products, including chemical-free feminine hygiene products.

115.    Prior to her purchase, Plaintiff Allen reviewed the Products' labeling, packaging, and marketing materials, including the Pure and Organic Representations on the Tampon Products' label.

116.    Plaintiff Allen reasonably understood Defendant's Pure and Organic Representations to mean that the Tampon Products would not contain harmful chemicals, especially chemicals that could pose a risk to her health and the environment, like PFAS.

117.    Plaintiff Allen relied on these representations when purchasing the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.

118.    Plaintiff Allen continues to seek out menstrual products that are free from harmful chemicals like PFAS, and she would like to purchase Defendant's products in the future if they

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

conform with Defendant's representations about the Products. However, Plaintiff Allen is currently unable to rely on Defendant's representations regarding its Products in deciding whether to purchase them in the future. Plaintiff Allen understands that the composition of the Products may change over time, but as long as Defendant may freely advertise the Products with the Pure and Organic Representations when it contains PFAS, Plaintiff Allen will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitors' products, which *are* in fact free from harmful chemicals like PFAS.

119.    As a direct and proximate result of Defendant's acts, including its affirmative misrepresentations, false statements and material omissions, Plaintiff Allen has incurred economic injuries including financial damages at the point-of-sale stemming from her purchase of and/or overpayment for the Products, in addition to the loss of the benefit of her bargain and the products' intended benefits.

### INJURY TO THE PUBLIC-AT-LARGE AND POTENTIAL FOR FUTURE HARM

120.    Defendant's wrongful conduct harms the public-at-large.

121.    PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

122.    PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

123.    PFAS chemicals are further known to negatively impact the environment.

124.    Because Defendant's deceptive advertising is ongoing and directed to the public, and because Defendant continues to sell its Products containing PFAS chemicals, the deception poses an ongoing risk to the public.

125.    As such, a public injunction must be provided in order to enjoin Defendant's

1  continued harm of consumers and the public-at-large.

2  **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

3  126.    Defendant had actual knowledge, or should have had actual knowledge, that its

4  Products contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

5  127.    Although Defendant was aware of the deception in its advertising, marketing,

6  packaging, and sale of the Products given the inclusion of PFAS chemicals, it took no steps to

7  disclose to Plaintiffs or Class Members that its Products contained PFAS chemicals.

8  128.    Despite its knowledge, Defendant has fraudulently misrepresented the Products as

9  having qualities and characteristics they do not, while concealing the fact that its Products contain

10  PFAS chemicals.

11  129.    Defendant has made, and continues to make, affirmative false statements and

12  misrepresentations to consumers, and continues to omit the fact that the Products contain PFAS, to

13  promote sales of its Products.

14  130.    Defendant has misrepresented, concealed, and otherwise omitted material facts that

15  would have been important to Plaintiffs and Class Members in deciding whether to purchase the

16  Products. Defendant's misrepresentations and omissions were knowing, and it intended to, and did,

17  deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and

18  Class Members reasonably relied upon Defendant's misrepresentations and concealment of these

19  material facts and suffered injury as a proximate result of that justifiable reliance.

20  131.    The PFAS chemicals in the design and/or manufacture of Defendant's Products were

21  not reasonably detectible to Plaintiffs and Class Members.

22  132.    At all times, Defendant actively and intentionally misrepresented the qualities and

23  characteristics of the Products, while concealing the existence of the PFAS chemicals and failing to

24  inform Plaintiffs or Class Members of the existence of the PFAS chemicals in its Products.

25  Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of

26  diligence on their part.

27  133.    Defendant's statements, words, and acts were made for the purpose of deceiving the

28  public, and suppressing the truth that the Products contained artificial, man-made PFAS chemicals.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

134.   Defendant misrepresented the Products and concealed the PFAS chemicals for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

135.   As a result of Defendant's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiffs and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Products.

136.   Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Products contained PFAS chemicals. Plaintiffs and Class Members had no realistic ability to discern that the Products contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the Products.

### FED. R. CIV. P. 9(b) ALLEGATIONS

137.   Although Defendant is in the best position to know what content it placed on its packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Products to Plaintiffs and consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

138.   **WHO**: Defendant made its Pure and Organic Representations on the Products' packaging, online, and in its marketing and advertising of the Products.

139.   **WHAT**: Defendant's conduct here was, and continues to be, deceptive and fraudulent because of its Pure and Organic Representations. Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products were manufactured and sold with the represented qualities. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

have.

140. **WHEN**: Defendant made material misrepresentations, false statements and/or material omissions during the putative class periods and at the time Plaintiffs and Class Members purchased the Products, prior to and at the time Plaintiffs and Class Members made claims after realizing the Products contained harmful, man-made chemicals, and continuously throughout the applicable class periods.

141. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Products' packaging.

142. **HOW**: Defendant made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Products.

143. **WHY**: Defendant made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the Products over other brands that did not make similar Pure and Organic Representations, the effect of which was that Defendant profited by selling the Products to many thousands of consumers.

144. **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Defendant's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

145. Plaintiffs bring this action individually and as a representative of all of those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and the members of the following proposed nationwide class ("Nationwide Class"):

> **During the fullest period allowed by law, all persons who purchased the Tampon Products in the United States within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

146. Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and the members of the following proposed multi-state class ("Multi-State Consumer Protection Class"):

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

> **During the fullest period allowed by law, all persons who purchased the Tampon Products in the States of California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, and Washington[51] within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

147.     Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of themselves and the members of the following class ("California Class"):

> **During the fullest period allowed by law, all persons who purchased the Tampon Products in the State of California within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

148.     The Nationwide Class, Multi-State Consumer Protection Class and California Class are referred to collectively as the "Class" or "Classes," and the members of the Classes are referred to as the "Class Members." Specifically excluded from the Classes are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the class definitions as necessary.

149.     <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, given the wide distribution of the Products, it is voluminous and nationwide. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable

---

[51] Plaintiffs seek to certify a Multi-State Consumer Protection Class consisting of persons in the following states (and implicating the following statutes): California (Cal. Bus. & Prof. Code §§ 17200, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 502/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*).

1    from information and records in the possession of Defendant and its authorized retailers.

2        150.    Typicality: The claims of the representative Plaintiffs are typical in that Plaintiffs,

3    like all Class Members, purchased the Products containing PFAS that were designed, manufactured,

4    marketed, advertised, distributed, and sold by Defendant. Plaintiffs, like all Class Members, have

5    been damaged by Defendant's misconduct in that, *inter alia*, they have incurred or will continue to

6    incur damage as a result of overpaying for a Product containing chemicals which makes the Products

7    not what reasonable consumers were intending to purchase. Furthermore, the factual basis of

8    Defendant's misconduct is common to all Class Members because Defendant has engaged in

9    systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the

10   same injury to all Class Members.

11       151.    Commonality: Common questions of law and fact exist as to all Members of the

12   Class. These questions predominate over questions that may affect only individual Class Members

13   because Defendant has acted on grounds generally applicable to the Class. Such common legal or

14   factual questions include, *inter alia*:

15   
16       (a)    Whether Defendant misrepresented that the Product is free from harmful
              ingredients;

17       (b)    Whether Defendant's practices in marketing, advertising and packaging the
18              Products tend to mislead reasonable consumers into believing that the Products are
              free from harmful chemicals, such as PFAS;
19
20       (c)    Whether Defendant engaged in false or misleading advertising;

21       (d)    Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices
              by selling and/or marketing the Products with the Pure and Organic Representations
22              and other misrepresentations and omissions as described herein;

23       (e)    Whether Defendant violated Cal. Bus. & Prof. Code §§ 17500, *et seq.* (FAL);

24       (f)    Whether Defendant violated Civil Code §§ 1750, *et seq.* (CLRA);

25       (g)    Whether Defendant violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* (UCL);

26       (h)    Whether Defendant engaged in deceptive trade practices by selling, packaging,
27              advertising and/or marketing the Products containing PFAS chemicals;

28       (i)    Whether Defendant engaged in false or misleading advertising by selling,

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

packaging, and/or marketing the Products containing PFAS chemicals;

(j)     Whether Plaintiffs and Class Members either paid a premium for the Products that they would not have paid but for its false representations or would not have purchased them at all;

(k)     Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

(l)     Whether Plaintiffs and Class Members have suffered an economic injury and the proper measure of their losses as a result of those injuries; and

(m)    Whether Plaintiffs and Class Members are entitled to injunctive, declaratory, or other equitable relief.

152.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer product, misrepresentation, and mislabeling class actions, and Plaintiffs intend to prosecute this action vigorously.

153.    <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and Plaintiffs and Class Members will continue to be deceived by Defendant's misrepresentations and omissions and unknowingly be exposed to the risk of harm associated with the PFAS chemicals in the Products. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

154.    <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

155.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

156.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

## **COUNT ONE**

### **Violation of State Consumer Protection Statutes**
### **(On Behalf of Plaintiffs and the Multi-State Consumer Protection Class)**

157.     Plaintiffs, individually and on behalf of the Multi-State Consumer Protection Class, repeat and re-allege all previous paragraphs as if fully included herein.

158.     Plaintiffs and Multi-State Consumer Protection Class Members have been injured as a result of Defendant's violations of the state consumer protection statutes listed above, which also provide a basis for redress to Plaintiffs and Multi-State Consumer Protection Class Members based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

159.     Defendant's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

160.     Defendant violated the Multi-State Consumer Protection Class states' unfair and deceptive acts and practices laws by representing the Products using the Pure and Organic Representations and other misrepresentations and omissions detailed herein, when, in reality, they contain unnatural, human-made PFAS chemicals known to be harmful to humans and the environment.

161.     Defendant's misrepresentations were material to Plaintiffs' and Multi-State Consumer Protection Class Members' decision to purchase the Products or pay a premium for the Products.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

162.    Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

163.    As a result of Defendant's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiffs and Multi-State Consumer Protection Class Members purchased and paid for Products that did not conform to Defendant's Product promotion, marketing, advertising, packaging, and labeling, and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products that they would not have purchased and used had they known the true facts about them

164.    As a result of Defendant's violations, Defendant has been unjustly enriched.

165.    Pursuant to the aforementioned States' unfair and deceptive practices laws, Plaintiffs and Multi-State Consumer Protection Class Members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## COUNT TWO

### Violation of the California Consumer Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.* (On Behalf of Plaintiffs and the California Class)

166.    Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege all previous paragraphs as if fully included herein.

167.    The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq*.

168.    The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

169.    Plaintiffs and California Class Members are "consumers" as defined by Civil Code § 1761(d).

170.    Defendant is a "person" as defined by Civil Code § 1761(c).

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

171. The Tampon Products qualify as "goods" as defined by Civil Code § 1761(a).

172. Plaintiffs and the California Class Members' purchases of the Tampon Products are "transactions" as defined by Civil Code § 1761(e).

173. As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

(a) "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." Civil Code § 1770(a)(5);

(b) "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7);

(c) "Advertising goods or services with intent not to sell them as advertised." Civil Code § 1770(a)(9); and

(d) "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Civil Code § 1770(a)(16).

174. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5), (a)(7), (a)(9) and (a)(16) when it represented, through its advertising and other express representations, that the Tampon Products had benefits or characteristics that they did not actually have.

175. As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA and has made representations regarding Tampon Products benefits or characteristics that they did not in fact have, and represented the Tampon Products to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiffs and California Class Members.

176. The Tampon Products are not Pure and Organic and are of an inferior quality and trustworthiness compared to other products in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that the Tampon Products meet a certain standard or quality.

177. As detailed above, Defendant violated the CLRA when it advertised the Tampon Products with the intent not to sell Tampon Products as advertised and knew that the Tampon

1   Products were not as represented.

2   178.   Specifically, Defendant marketed and represented the Tampon Products with the

3   Pure and Organic Representations, when in fact no reasonable consumer would believe the products

4   to be Pure and Organic if they knew they contained a potentially harmful chemical such as PFAS.

5   179.   Defendant's deceptive practices were specifically designed to induce Plaintiffs and

6   California Class Members to purchase or otherwise acquire the Tampon Products.

7   180.   Defendant engaged in uniform marketing efforts to reach California Class Members,

8   their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the

9   Tampon Products manufactured by Defendant. Defendant's packaging, advertising, marketing,

10  website and retailer product identification and specifications, contain numerous false and misleading

11  statements regarding the quality, safety, and reliability of the Tampon Products.

12  181.   Despite these Pure and Organic Representations, Defendant also omitted and

13  concealed information and material facts from Plaintiffs and California Class Members.

14  182.   In their purchase of Tampon Products, Plaintiffs and California Class Members relied

15  on Defendant's representations and omissions of material facts.

16  183.   These business practices are misleading and/or likely to mislead consumers and

17  should be enjoined.

18  184.   Pursuant to Cal. Civ. Code § 1782, Plaintiffs Bounthon and Rivera notified

19  Defendant in writing by certified mail sent on February 14, 2023, of its violations of § 1770

20  described above and demanded that it correct the problems associated with the actions detailed

21  above and give notice to all affected consumer of Defendant's intent to do so. If Defendant does not

22  agree to rectify the problems identified and give notice to all affected consumers within 30 days of

23  the date of written notice, Plaintiffs will amend this Complaint to seek actual, punitive and statutory

24  damages, as appropriate.

25  185.   A declaration establishing that venue in this District is proper pursuant to Cal. Civ.

26  Code § 1780(d) is attached hereto as Exhibit A.

27  186.   In accordance with Civil Code § 1780(a), Plaintiffs and the other California Class

28  Members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

## COUNT THREE

### Violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* (On Behalf of Plaintiffs and the California Class)

187.    Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege all previous paragraphs as if fully included herein.

188.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

189.    Plaintiffs and Class Members who purchased Defendant's Tampon Products suffered an injury by virtue of buying products in which Defendant misrepresented and/or omitted the Tampon Products' true quality, reliability, safety, and use. Had Plaintiffs and Class Members known that Defendant materially misrepresented the Tampon Products and/or omitted material information regarding its Tampon Products, they would not have purchased the Tampon Products.

190.    Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this complaint.

191.    There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Tampon Products.

192.    Plaintiffs and Class Members who purchased Defendant's Product had no way of reasonably knowing that the Tampon Products were deceptively packaged, marketed, advertised, and labeled, were not safe, and were unsuitable for their intended use. Thus, Plaintiffs and California Class Members could not have reasonably avoided the harm they suffered.

193.    Specifically, Defendant marketed, labeled, and represented the Tampon Products with the Pure and Organic Representations, when in fact the Tampon Products contain PFAS, which no reasonable consumer would believe was in products with the Pure and Organic Representations.

194.    The gravity of the harm suffered by Plaintiffs and Class Members who purchased Defendant's Tampon Products outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Tampon Products in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

established public policies as set out in federal regulations and are substantially injurious to Plaintiffs and California Class Members.

195.    The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiffs and Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Tampon Products, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

196.    As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf of the general public, seek injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.

## COUNT FOUR

**Violation of the California False Advertising Law ("FAL")**
**California Business and Professions Code §§ 17500, *et seq*.**
**(On Behalf of Plaintiffs and the California Class)**

197.    Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege all previous paragraphs as if fully included herein.

198.    The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

199.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

200.    Specifically, Defendant marketed, labeled, and represented the Tampon Products with the Pure and Organic Representations, when in fact the Tampon Products contain PFAS, which no reasonable consumer would believe was in products with the Pure and Organic Representations.

201.    At the time of its misrepresentations, Defendant was either aware that Tampon

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

1  Products contained PFAS, which no reasonable consumer would expect would be in products with

2  the Pure and Organic Representations or was aware that it lacked the information and/or knowledge

3  required to make such a representation truthfully. Defendant concealed and omitted and failed to

4  disclose this information to Plaintiffs and California Class Members.

5      202.    Defendant's descriptions of the Tampon Products were false, misleading, and likely

6  to deceive Plaintiffs and other reasonable consumers.

7      203.    Defendant's conduct therefore constitutes deceptive or misleading advertising.

8      204.    Plaintiffs have standing to pursue claims under the FAL as they reviewed and relied

9  on Defendant's packaging, advertising, representations, and marketing materials regarding the

10  Tampon Products when selecting and purchasing the Tampon Products.

11      205.    In reliance on the statements made in Defendant's advertising and marketing

12  materials and Defendant's omissions and concealment of material facts regarding the quality and

13  use of the Tampon Products, Plaintiffs and California Class Members purchased the Tampon

14  Products.

15      206.    Had Defendant disclosed the true nature of the Tampon Products (that they contain

16  PFAS), Plaintiffs and California Class Members would not have purchased Tampon Products or

17  would have paid substantially less for them.

18      207.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant

19  has received ill-gotten gains and/or profits, including but not limited to money from Plaintiffs and

20  California Class Members who paid for the Tampon Products, which contained chemicals and were

21  not organic.

22      208.    Plaintiffs and California Class Members seek injunctive relief, restitution, and

23  disgorgement of any monies wrongfully acquired or retained by Defendant and by means of its

24  deceptive or misleading representations, including monies already obtained from Plaintiffs and

25  California Class Members as provided for by the California Business and Professions Code § 17500.

26

27

28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104

## COUNT FIVE

### Unjust Enrichment/Quasi-Contract
### (On Behalf of Plaintiffs and the Nationwide Class, or, in the Alternative, the California Class)

209.    Plaintiffs bring this count on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, the California Class (in this count referred to as the "Class" Members), and hereby repeat and re-allege all previous paragraphs, as if fully included herein.

210.    Defendant's unfair and unlawful contract includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Complaint. Defendant's acts and business practices offend the established public policy of California, as there is no societal benefit from false advertising, only harm. While Plaintiffs and Class Members were harmed at the time of purchase, Defendant was unjustly enriched by its misrepresentations and omissions.

211.    Plaintiffs and Class Members were harmed when purchasing Defendant's Products as a result of Defendant's material representations and omissions, as described in this Complaint. Plaintiffs and each Class Member purchased Defendant's Products. Plaintiffs and Class Members have suffered injury in fact and lost money as a result of paying the price they paid for the Products as a result of Defendant's unlawful, unfair, and fraudulent business practices.

212.    Defendant's conduct allows Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment of, Plaintiffs and Class Members, and to Defendant's benefit and enrichment. Defendant's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

213.    Plaintiffs and Class Members confer significant financial benefits and pay substantial compensation to Defendant for its Products, which are not as Defendant represents them to be.

214.    Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiffs' and Class Members' overpayments.

215.    Plaintiffs and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class Members

1 || may seek restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Name Plaintiffs as Class Representatives and Plaintiffs' attorneys as Class Counsel;

c. Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Classes in an amount to be determined at trial;

d. Grant restitution to Plaintiffs and the Classes and require Defendants to disgorge its ill-gotten gains;

e. Permanently enjoin Defendants from engaging in the wrongful and unlawful conduct alleged herein;

f. Award Plaintiffs and the Classes their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

g. Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

h. Award such further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

DATED: February 21, 2023          Respectfully submitted,

_/s/ Benjamin E. Shiftan_
BENJAMIN E. SHIFTAN, SBN 265767
**PEARSON WARSHAW, LLP**
555 Montgomery St., Suite 1205
San Francisco, CA 94111
T: (415) 433-9000
bshiftan@pwfirm.com

Melissa S. Weiner*
**PEARSON WARSHAW, LLP**
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
T (612) 389-0600
mweiner@pwfirm.com

1

2   Rachel Soffin*
    **MILBERG COLEMAN BRYSON PHILLIPS**
3   **GROSSMAN, LLP**
    800 S. Gay Street, Suite 1100
4   Knoxville, TN 37929
    rsoffin@milberg.com

5   Harper T. Segui*
    **MILBERG COLEMAN BRYSON PHILLIPS**
6   **GROSSMAN, LLP**
    825 Lowcountry Blvd., Suite 101
7   Mt. Pleasant, SC 29464
    hsegui@milberg.com

8   Erin J. Ruben*
9   **MILBERG COLEMAN BRYSON PHILLIPS**
    **GROSSMAN, LLP**
10  900 W. Morgan Street
    Raleigh, NC 27603
11  P.O. Box 12638
    Raleigh, NC 27605
12  eruben@milberg.com

13

14  *Attorneys for Plaintiffs and the Putative Classes*

15  *\*Pro Hac Vice Forthcoming*

16

17

18

19

20

21

22

23

24

25

26

27

28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94104