UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITTANY BOUNTHON, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>　　　　Defendant. | Case No. 23-cv-00765-AMO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH LEAVE TO AMEND; GRANTING REQUEST FOR JUDICIAL NOTICE**<br><br>Re: Dkt. Nos. 71, 72 |

　　　　This is one of three proposed class actions raising mislabeling claims based on the presence of per- and polyfluoroalkyl substances ("PFAS") in tampons.[1]  Defendant Procter & Gamble Company ("P&G") moves to dismiss the second amended complaint filed by Plaintiffs Britanny Bounthon, Viviana Rivera, and Gina Allen.  The Court held a hearing on the matter on October 10, 2024.  Having considered the papers filed by the parties, the arguments advanced during the hearing, and the relevant legal authority, the motion is **GRANTED IN PART AND DENIED IN PART WITH LEAVE TO AMEND** for the reasons set forth below.

///

///

///

///

---

[1] The other two putative class cases – *Lowe v. Edgewell Personal Care Company*, No. 3:23-cv-00834-AMO (N.D. Cal. filed. Feb. 24, 2024) and *Mack v. Edgewell Personal Care Company*, No. 3:23-cv-00837-AMO (N.D. Cal. filed Feb. 24, 2024) – are stayed while this matter proceeds.  ECF 70.

## I.   BACKGROUND

### A.   Factual Background[2]

#### 1.   Tampax Pure Cotton Tampons

In 1997, P&G purchased Tampax.  ECF 67 ("SAC") ¶ 31.  P&G now designs, manufactures, markets, and sells tampons under the Tampax brand name.  *Id.*  In 2019, it introduced a line of Pure Cotton Tampons (the "Tampon Products" or "Products") to keep up with competitors and changing consumer preferences.  *Id.* ¶ 35.  The label on the front of the box contains the following representations:

- Tampax Pure Cotton
- 100% organic cotton core
- Tampons free of dyes, fragrances, and chlorine bleaching

*Id.* ¶¶ 5, 39.  These representations appear on the front label of the Products as shown below:



---

[2] This factual background is based on the well-pleaded allegations in the second amended complaint, which are taken as true and viewed in the light most favorable to Plaintiffs for the purpose of the instant motion.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

*Id.* ¶¶ 5, 39.[3]

The label on the back of the box says that the Products are "The Best of Science and Nature" and contain "100% Organic" cotton. *Id.* ¶¶ 6, 40. Those representations appear on the back label as shown below:



*Id.* Plaintiffs refer to the representations appearing on the front and back labels as the "Pure and Organic Representations." *Id.* ¶¶ 7, 39-40. They allege that P&G intentionally designed the labels to include the representations "in order to lead reasonable consumers to believe that the Tampon Products do not contain any potentially harmful chemicals" or "artificial ingredients."[4] *Id.* ¶¶ 7, 38; *see also id.* ¶¶ 55-56. According to Plaintiffs, the Pure and Organic Representations are false and misleading because the Products contain harmful PFAS. *Id.* ¶ 10.

---

[3] The Court notes Plaintiffs allege that the representations include "Tampax Pure Cotton" and "100% Organic Cotton Core" but exclude the corresponding asterisks appearing on the label. *See* SAC ¶¶ 5-6.

[4] Plaintiffs also allege that P&G engaged in a pervasive marketing campaign to further its "Pure & Organic" messaging. *See id.* ¶¶ 38-56.

3

### 2. PFAS

PFAS are "man-made," "not naturally occurring," and "indisputably synthetic chemicals." *Id.* ¶¶ 57-58. These substances' hydrophobic properties "make tampons more absorbent by drawing liquid into the products' absorbent core and preventing wicking and leakage." *Id.* ¶¶ 59-60. "[A]ll PFAS are harmful" and "can be harmful even at extremely low levels of exposure." *Id.* ¶¶ 63-64. "There is no 'safe' level of exposure . . .[,] even 'trace' levels of PFAS can pose a risk to humans." *Id.* ¶ 65.

PFAS have been linked to decreased fertility, negative developmental effects in children, increased risk of cancer, liver damage, thyroid disease, adverse impacts on the immune system, interference with hormones, and increased cholesterol levels. *Id.* ¶ 67. "There is no treatment to remove PFAS from the body," so "experts agree the most effective strategy to decrease risk is to avoid and/or limit exposure to products known to contain PFAS." *Id.* ¶¶ 76-77. Because all PFAS contain carbon-fluorine bonds, one of the strongest in nature, PFAS are sometimes referred to as "forever chemicals." *Id.* ¶ 61.

### 3. Detecting PFAS

Targeted analysis and total organic fluorine ("TOF") analysis are the two primary testing methods for detecting PFAS. *Id.* ¶ 81. Targeted analysis detects the presence of specific PFAS, and its results are limited to a defined list of potential PFAS. *Id.* ¶ 82. Targeted analysis can, at most, detect only 0.006% of the over 12,000 PFAS in existence. *Id.* ¶ 84. Because of this limitation, targeted analysis "cannot provide a comprehensive measure of the total quantity of PFAS that may be present in a sample . . . ." *Id.* ¶ 85. As a result, targeted testing cannot certify a sample as containing no PFAS; it can only certify a sample as being free of the specific PFAS it can detect. *Id.* ¶ 86.

In contrast, TOF testing detects organic fluorine, "the foundational element – and defining characteristic – of PFAS." *Id.* ¶ 87. Organic fluorine "is created by the chemical bond between carbon atoms and fluorine atoms." *Id.* ¶ 88. This strong bond "is what defines PFAS chemicals and is the reason for their functional benefits." *Id.* ¶ 90. Organic fluorine is present in all PFAS varieties; it is "not naturally present in the human body[,] and it is practically nonexistent outside

4

of its use in synthetic PFAS chemicals."[5] *Id.* ¶¶ 91, 94. Its detection "in a sample necessarily means that PFAS are present in some form." *Id.* "It is *extremely* unlikely (if not impossible) that TOF testing would yield a 'false positive' for PFAS as it only measures fluorine that originates from a substance where fluorine is attached to a carbon backbone (i.e., the building blocks of PFAS)." *Id.* ¶ 93. The testing "does not detect any other forms of fluorine, such as inorganic fluorine (i.e., fluoride)." *Id.* "TOF analysis is the only method that can reliably indicate the presence or absence of any of the tens of thousands of varieties of PFAS for which no targeted testing is currently available by identifying the foundational element of all PFAS – organic fluorine." *Id.* ¶ 96. It "has been widely accepted by scientists, researchers, and regulators as the reliable indicator that a sample contains PFAS." *Id.* ¶ 97. "California requires the use of TOF testing to ensure compliance with regulations regarding the presence of PFAS in certain consumer products." *Id.* ¶ 98. The "testing is more reliable than targeted testing in demonstrating the presence of PFAS in a particular sample." *Id.* ¶ 100.

            4.     <u>Plaintiffs' Testing</u>

Plaintiffs commissioned independent third-party TOF testing of three different samples from a certified laboratory. *Id.* ¶¶ 104, 105. In March 2022, Plaintiffs tested "the whole finished Tampon Product." *Id.* ¶ 106. In April 2023, Plaintiffs "then conducted a second round of testing . . . , this time analyzing each individual component of the Tampon Products – the absorbent core, the fabric overwrap, the string, and the applicator." *Id.* The "testing uniformly showed that the finished Tampon Products and each of their individual components contained PFAS." *Id.* ¶ 108. "The amount of PFAS detected in the Tampon Product samples was above trace amounts and well within detection limits." *Id.* The results indicated "a total PFAS concentration of more than 30 ppm [or parts per million] in some of the individual components, with much higher concentrations of PFAS in the aggregate." *Id.* ¶ 109.

According to Plaintiffs, based on their testing results, patent applications showing the use

---

[5] "The exceedingly rare examples of organic fluorine from sources other than manmade PFAS – the most famous of which is the deadly poison monofluoroacetic acid from a rare indigenous South African plant – are not found or used in the industrial world and would never be the source of organic fluorine in a consumer product (even as an incidental contaminant)." *Id.* ¶ 95.

5

of hydrophobic components in P&G's tampon products, industry wide practices,[6] peer-reviewed studies and other third-party testing that has revealed the presence of PFAS in tampons, and the functional purpose of PFAS in menstrual products, "it is reasonable to conclude that PFAS is present in the Tampon Products." *Id.* ¶¶ 110-114.

### B. Procedural Background

Plaintiffs commenced this action on February 21, 2023. ECF 1. P&G moved to dismiss Plaintiffs' initial complaint on April 14, 2023. ECF 25. By stipulation of the parties, Plaintiffs filed a first amended complaint in lieu of opposing the motion to dismiss. ECF 27, 39. On June 23, 2023, P&G moved to dismiss the first amended complaint. ECF 42. After full briefing, the Court granted P&G's motion with leave to amend. ECF 47, 50, 59.

Plaintiffs filed the operative second amended complaint on February 21, 2024. ECF 67. In it, Plaintiffs assert claims for (1) violation of consumer protection statutes (under the laws of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington), (2) violation of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*, (3) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, (4) violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, and (5) "unjust enrichment/quasi-contract." SAC ¶¶ 204, 214-280, n.73.

Plaintiffs, who each purchased the Products in California, seek to represent the following proposed classes:

- Nationwide Class: "**During the fullest period allowed by law, all persons who purchased the Tampon Products in the United States within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**"

- Multi-State Consumer Protection Class: "**During the fullest period allowed by law, all persons who purchased the Tampon Products in the States of California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Washington within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**"

---

[6] Plaintiffs do not specify what these "industry wide practices" are. *See generally* SAC.

- California Class: "**During the fullest period allowed by law, all persons who purchased the Tampon Products in the State of California within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**"

SAC ¶¶ 157, 164, 171; 203-05 & n.73 (emphasis in original).

On April 11, 2024, P&G moved to dismiss the second amended complaint and filed an accompanying request for judicial notice. ECF 71 ("Mot."), 72 ("RJN"). On April 25, 2024, Plaintiffs filed their opposition to the motion, without a response to P&G's request for judicial notice. ECF 73 ("Opp."). P&G's reply followed on May 2, 2024. ECF 74 ("Reply"). Plaintiffs filed two notices of supplemental authority, one on September 12, 2024, and one on October 2, 2024. ECF 76, 77. The Court held a hearing on P&G's motion on October 10, 2024. ECF 78.

## II.   LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 12(b)(1)

"To satisfy Article III's case or controversy requirement, a plaintiff must establish that [they] ha[ve] standing to invoke the jurisdiction of the federal courts." *Bowen v. Energizer Holdings, Inc.*, --- F.4th ---, ----, 2024 WL 4352496, at *4 (9th Cir. Oct. 1, 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Article III standing requires a showing of an injury in fact that is traceable to the challenged conduct and redressable by a favorable ruling. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

A challenge to standing under Rule 12(b)(1) can be facial or factual. A facial attack presumes "the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.' " *Id.* (quoting *Safe Air for Everyone*, 373 F.3d at 1039). A factual attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). In resolving a factual challenge, once the defendant contests the truth of the plaintiff's factual allegations, the plaintiff has the burden to support their allegations with competent proof. *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 944 (9th Cir. 2021) (quoting *Leite*, 749 F.3d at 1121). In resolving

1    such a challenge, when the "jurisdictional issues are 'intertwined with an element of the merits of
2    the plaintiff's claim,' the court must treat the motion like a motion for summary judgment and
3    'leave the resolution of material factual disputes to the trier of fact.' " *Bowen*, 2024 WL 4352496,
4    at *5 (quoting *Leite*, 749 F.3d at 1122).  But when the allegations relating to standing are
5    "separable from the merits of the case[,]" the Court is free to "resolv[e] factual disputes if
6    necessary." *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 n.2 (9th Cir. 2023).

   **B.    Federal Rule of Civil Procedure 12(b)(6)**

       A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal
sufficiency of the claims alleged in the complaint.  *Ileto v. Glock*, 349 F.3d 1191, 1199-1200 (9th
Cir. 2003).  To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the
plaintiff's complaint " 'must . . . suggest that the claim has at least a plausible chance of
success.' " *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century
Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)).  In ruling
on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe
the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031.

       "[A]llegations in a complaint . . . may not simply recite the elements of a cause of action,
but must contain sufficient allegations of underlying facts to give fair notice and to enable the
opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652
F.3d 1202, 1216 (9th Cir. 2011)).  The court may dismiss a claim "where there is either a lack of a
cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim."
*Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside
Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008)).  "[T]he non-conclusory 'factual
content' and reasonable inferences from that content must be plausibly suggestive of a claim
entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

**III.   DISCUSSION**

       Before turning to P&G's motion to dismiss, the Court first takes up P&G's unopposed
request for judicial notice.

///

**A.     Request for Judicial Notice**

Defendants ask that the Court take judicial notice of the following eight documents that are fairly incorporated by reference into Plaintiffs' second amended complaint.  *See* RJN at 2-3.

- Exhibit A: The article entitled, "Total Organofluorine (TOF) Analysis by Combustion Ion Chromatography – A New Tool for Monitoring PFAS Impacts[,]" the abstract of which Plaintiffs cite in support of their allegation that TOF testing is extremely unlikely to yield a false positive.  *See* SAC ¶ 93 & n.57.
- Exhibit B: A webpage of the United States Environmental Protection Agency, captioned, "Our Current Understanding of the Human Health and Environmental Risks of PFAS[,]" on which Plaintiffs rely for the allegations about the adverse health risks associated with PFAS exposure.  *See id.* ¶ 67 & n.41.
- Exhibit C: A webpage from the Agency for Toxic Substances and Disease Registry captioned, "What are the health effects of PFAS?[,]" which Plaintiffs cite as support for their allegations that PFAS are man-made and have been used in various products since the 1940s.  *See id.* ¶ 58 & n.34.
- Exhibit D:  A Washington Post article titled, "EPA warns toxic 'forever chemicals' more dangerous than once thought[,]" which Plaintiffs cite as support for the allegation that PFAS can be harmful even at extremely low levels of exposure.  *See id.* ¶ 64 & n.38.
- Exhibit E: An article appearing in Science Direct, titled "70 analyte PFAS test method highlights need for expanded testing of PFAS in drinking water," which Plaintiffs cite in support of their allegation that scientists were recently able to develop an advanced targeted test to detect 70 PFAS.  *See id.* ¶ 84 & n.55.
- Exhibit F: An article appearing in Environmental Science & Technology, titled "Organic Fluorine as an Indicator of Per- and Polyfluoroalkyl Substances in Dust from Buildings with Healthier versus Conventional Materials[,]" which Plaintiffs cite as support for their allegation that TOF testing is the gold standard. *See id.* ¶ 12 & n.7.

- Exhibit G: An article published by University of Notre Dame News, titled "Scientists find PFAS in feminine hygiene products," which Plaintiffs cite in support of their allegation that peer-reviewed studies and other third-party testing have detected PFAS in menstrual products. *See id.* ¶ 113 & n.63.
- Exhibit H: A paper titled, "Naturally occurring Organic Fluorine Compounds[,]" which Plaintiffs cite as support for the allegation that the rare PFAS occurring naturally would never be the source of organic fluorine found in a consumer product. *See id.* ¶ 95 & n.58.

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Khoja v. Orexigen Therapeutrics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "Although the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.* at 1003.

In applying this standard, the Ninth Circuit instructs:

> When a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling. Similarly, where a complaint incorrectly summarizes or characterizes a legally operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, the document itself is controlling. . . . But if specific facts alleged in the complaint contradict specific facts related in a non-legally-operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, the conflict is resolved in the plaintiff's favor.

*In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023) (citations omitted).

Applying these principles here, the Court finds that Exhibits A-H are properly incorporated by reference in Plaintiffs' second amended complaint. They are the source of many of Plaintiffs' allegations concerning the presence of PFAS in tampons and their harmfulness, which underpins

Plaintiffs' theory of deception. Under these circumstances, granting P&G's request is in keeping with the policy behind the incorporation by reference doctrine, that is, "[p]reventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based[.]" *See Cohen v. Facebook*, 798 F. Supp. 2d 1090, 1094 (N.D. Cal. 2011) (internal quotations and citation omitted).

For these reasons, P&G's request for judicial notice is **GRANTED**.

### B. Motion to Dismiss

P&G moves to dismiss Plaintiffs' second amended complaint on eight grounds. First, it argues that Plaintiffs have failed to sufficiently allege that P&G's tampon products contain unsafe levels of harmful PFAS. Mot. at 16-21. Second, P&G argues that Plaintiffs lack Article III standing. *Id.* at 21-24. Third, P&G contends that Plaintiffs have insufficiently alleged reliance. *Id.* at 24-25. Fourth, P&G argues that the challenged misrepresentations cannot mislead a reasonable consumer. *Id.* at 25-30. Fifth, P&G contends that Plaintiffs' omission-based allegations fail the particularity requirements of Federal Rule of Civil Procedure 9(b). *Id.* at 30-31. Sixth, P&G argues that Plaintiffs' claim under the UCL's unlawful prong fails for lack of an underlying violation of law. *Id.* at 31. Seventh, P&G contends that Plaintiffs' unjust enrichment claim rises and falls with their other purportedly deficient claims and separately fails because Plaintiffs do not allege that they lack an adequate remedy at law. *Id.* at 31-32. Finally, P&G seeks dismissal of claims asserted on behalf of putative class members who purchased Tampon Products outside of California and rely on the laws of other states for their causes of action. *Id.* at 32-33. The Court first addresses the threshold issue of standing before turning to P&G's other arguments.

#### 1. Standing

P&G contends that Plaintiffs lack standing because they have failed to allege an actual injury. Mot. at 21. According to P&G, because Plaintiffs have failed to allege facts plausibly establishing that the Tampon Products contain "***any*** level of ***any PFAS***, much less one that could potentially render it unsafe[,]" their allegations of economic injury are speculative and thus insufficient to allege a concrete injury required for Article III standing. *Id.* at 21-22.

The Ninth Circuit's recent decision in *Bowen v. Energizer Holdings, Inc.* dispenses with

11

P&G's standing arguments. In that case, the plaintiff brought a putative class action alleging that the defendants' sunscreen products contained an unsafe level of benzene, a carcinogen known to cause cancer. --- F.4th ----, ----, 2024 WL 4352496, at *1 (9th Cir. Oct. 1, 2024). The plaintiff asserted nine claims under California law, including the FAL, UCL, and CLRA. *Id.* at *3 n.4. The plaintiff specifically alleged that she "would have never paid a premium for sunscreen products that contained or were at risk of containing the carcinogen benzene[,]" and that she "suffered economic injury when she spent money to purchase sunscreen products she would not otherwise have purchased, or [would have] paid less for, absent Defendants' misconduct . . . ." *Id.* at *3 (second modification in original). Relying on an FDA "guideline permitting 2 ppm of benzene in sunscreen," the district court granted the defendants' motion to dismiss under Rule 12(b)(1). *Id.* at *4. It determined that the plaintiff "d[id] not allege facts that tend to show a non-speculative increased health risk or actual economic harm[.]" *Id.* (internal quotations omitted).

The Ninth Circuit reversed, finding that the plaintiff's allegations about paying a price premium and spending money on products she would not have purchased, or paid less for, "outline[d] a theory of economic injury that qualifie[d] as an injury in fact under established Article III standing caselaw." *Id.* at *8 (citing *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012); *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015)); *see also POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014) ("A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III . . . .")). It also considered the remaining elements of causation and redressability sua sponte, finding those elements met in light of the plaintiff's allegations that she purchased the sunscreen products based on the defendants' alleged misrepresentations and sought damages to recoup the price premium she paid as a result.[7] *Id.* at *10-*11.

In the briefing, neither side addresses whether P&G's standing challenge is a facial attack

---

[7] The defendants moved to dismiss the plaintiff's complaint for several reasons, including for lack of standing, failure to state a claim, and failing to plead allegations grounded in fraud with particularity. *Bowen*, 2024 WL 4352496, at *4. Because the district court only considered the standing question, the Ninth Circuit remanded for further proceedings. *Id.* at *4, *11.

or a factual one. At the hearing, P&G clarified that its challenge is facial. While *Bowen* involved a factual challenge, it nonetheless illustrates why Plaintiffs have established standing despite P&G's argument to the contrary.

Here, each Plaintiff alleges that she was deprived of the benefit of her bargain, thus incurring "financial damages at the point-of-sale stemming from her purchase and/or overpayment for the Products." SAC ¶¶ 163, 170, 177. Each Plaintiff alleges that she relied on P&G's representations about the Tampon Products and "would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known." *Id.* ¶¶ 161, 168, 175. Each Plaintiff also seeks to recover the overpayment. *See, e.g.*, *id.* ¶ 279. These allegations track those found sufficient in *Bowen*, and the Court finds them sufficient to establish standing.

Accordingly, P&G's motion to dismiss for lack of standing is **DENIED**.

### 2. PFAS Allegations

P&G next attacks the sufficiency of Plaintiffs' allegations that the Tampon Products contain harmful PFAS. Mot. at 16-21. Its challenge to these allegations is two-fold. *Id.* at 17-20. First, P&G argues that Plaintiffs fail to plausibly allege that the presence of organic fluorine is indicative of the presence of PFAS. *Id.* at 17-19. Second, P&G contends that even if Plaintiffs' allegations about the significance of organic fluorine were credited, their allegations about the findings of their TOF testing does not adequately establish that the PFAS levels detected in the Tampon Products is harmful. *Id.* at 20-21.

Plaintiffs counter that P&G merely "cherry picks allegations from the SAC to support its conclusion that Plaintiffs' testing results fail to support a conclusion that exposure can pose a danger to human health." Opp. at 16. Plaintiffs contend they satisfy the pleading standard because they allege that the "results of [their] TOF testing indicated a total PFAS concentration of more than 30 ppm in some of the individual components, with much higher concentrations of PFAS in the aggregate[,]" and that "there is no 'safe' level of exposure with regard to these chemicals" as "PFAS can be harmful at even extremely low levels of exposure." *Id*. (citing SAC ¶¶ 64, 65, 109).

Plaintiffs rely on TOF testing to demonstrate the presence of PFAS in the Tampon

1  Products.  However, the exhibits Plaintiffs cite in their complaint call into question this very

2  inference.  The documents, discussed below, illustrate that Plaintiffs have not plausibly alleged

3  that the presence of organic fluorine, as detected by their TOF analysis, indicates that the Tampon

4  Products contain PFAS.

5        The document Plaintiffs cite in their complaint for the proposition that TOF is the gold

6  standard of testing also says that "TOF may detect organofluorine chemicals that are not PFAS"

7  and that there are "gaps that need to be addressed by regulatory and scientific communities, in

8  particular, the need for expanded targeted analysis of PFAS, the development of a sensitive, broad

9  spectrum PFAS test, and further investigation into ultrashort chain PFAS."  ECF 72 at 33 (RJN,

10 Ex. E).  Another document, which Plaintiffs cite for the proposition that peer-reviewed studies and

11 other third-party testing have detected PFAS in menstrual products, states that a type of "targeted

12 PFAS analysis . . . is the necessary confirmation that the total fluorine measured originally comes

13 from the use of polymeric and non-polymeric PFAS . . . ."  ECF 72 at 50 (RJN, Ex. G).  It also

14 states that "[a] much larger study is needed to make stronger conclusions about the feminine

15 hygiene product industry as a whole."  *Id.*  Another source notes that "the number of compounds

16 containing fluorine is increasing in pharmaceutical drugs and organic electronics materials" and

17 "there have been about 30 natural products discovered that contain C-F bonds."  ECF 72 at 55

18 (RJN, Ex. H).[8]  Plaintiffs do not address these statements or any of the others that P&G highlights

19 as refuting the allegations in the second amended complaint.  *See generally* Opp.  Nonetheless, the

20 documents Plaintiffs cite in their complaint show that Plaintiffs' allegations about the inference to

21 be drawn from TOF testing is not plausible.  *See Andrews v. Procter & Gamble Co.*, No.

22 EDCV1900075AGSHKX, 2019 WL 6520045, at *3 (C.D. Cal. June 3, 2019) (granting motion to

23 dismiss where the plaintiffs alleged that a study established that the product at issue contained

24 elevated amounts of PFAS but in fact only screened the product for fluorine, indicating that PFAS

---

[8] In granting the prior motion to dismiss, the Court found that "allegations referencing patent applications . . . [we]re likewise deficient, as Plaintiffs merely speculate[d] that the hydrophobic components mentioned therein must or are likely to contain forever chemicals because those chemicals are 'frequently' used to make materials water-repellant."  *Lowe v. Edgewell Pers. Care Co.*, 711 F. Supp. 3d 1097, 1104 (N.D. Cal. 2024).  The allegations in the operative complaint suffer from the same infirmity.

14

"might be present"); *Dalewitz v. Procter & Gamble Co.*, No. 7:22-CV-07323 (NSR), 2023 WL 6215329, at *3 (S.D.N.Y. Sept. 22, 2023) (dismissing claims where the plaintiff's testing confirmed findings of a study that screened for fluorine in the products at issue, but the study indicated that further data was required for verification and finding that "neither the test[ing] nor the [s]tudy in fact identified the presence of PFAS in the [p]roduct, let alone . . . the presence of specific PFAS within the family of 9,000 potential PFAS").

Even if Plaintiffs had plausibly alleged that organic fluorine shows the presence of PFAS in the Tampon Products, they have failed to plausibly allege PFAS are present in the Products at a harmful level. Plaintiffs allege that their testing detected PFAS levels of 30 parts per million, with higher concentrations in the aggregate. *See* SAC ¶ 109. Even if taken as true, Plaintiffs have failed to plausibly allege that these levels are harmful. A study of carpet and furniture that Plaintiffs cite in their complaint defined the presence of less than 100 parts per million as "trace concentrations of PFAS . . . ." ECF 72 at 42 (RJN, Ex. F). It defined "healthier" carpet and furniture as "free of all types of PFAS" if meeting "a certain reporting threshold such as 100 ppm." *Id.* at 38.

The California statute – Health and Safety Code Section § 108945 – on which Plaintiffs rely in connection with their allegation that the state regulates the presence of PFAS in consumer goods also reinforces the implausibility of Plaintiffs' allegations that *any* concentration of PFAS in the Tampon Products is harmful. The statute defines " '[r]egulated perfluoroalkyl and polyfluoroalkyl substances' or 'regulated PFAS' " as either:

> (1) PFAS that a manufacturer has intentionally added to a product and that have a functional or technical effect in the product, including, but not limited to, the PFAS components of intentionally added chemicals and PFAS that are intentional breakdown products of an added chemical that also have a functional or technical effect in the product.
>
> (2) The presence of PFAS in a product or product component at or above 100 parts per million, as measured in total organic fluorine.

Cal. Health & Safety Code § 108945(b)(1)-(2). As relevant here, the threshold set forth in the statute is well above the 30 parts per million that Plaintiffs allege they detected in the Tampon Products through their independent testing.

15

Because the sources on which Plaintiffs rely undercut the plausibility of their claims of the harmfulness of certain PFAS levels, their reliance on the cases the Court previously found distinguishable remains misplaced. *See Lowe*, 711 F. Supp. 3d at 1104-05. As the Court already explained, in *Warren v. Whole Foods Market California, Inc.*, the plaintiffs brought false advertising claims because coffee creamer labeled "Vanilla" and "Naturally Flavored" contained artificial flavoring. No. 21-cv-04577-EMC, 2022 WL 2644103, at *1 (N.D. Cal. July 8, 2022). In that case, the plaintiffs alleged that they conducted testing that detected "atypically elevated levels" of guaiacol, which suggested the presence of "chemically synthesized vanillin" that is not derived from the vanilla plant. *Id.* The *Warren* plaintiffs included a photocopy of their test results showing ethyl vanillin at a concentration of 2.205 parts per million, a "non-infinitesimal amount" that was "not explained by relation to any other compounds." *Id.* at *5, *7. The plaintiffs also alleged that the specific vanillin detected during their testing was an artificial, synthetic ingredient that was not naturally derived. *Id.* Their allegation that the substance was not naturally derived was based in part, on the related allegation that there was "an absence of expected amounts of key aromatic compounds." *Id.* at *7.

In *Kanan v. Thinx Inc.*, the plaintiffs alleged that the defendant's underwear products contained levels of PFAS that were "above trace amounts." *See* No. CV 20-10341 JVS, 2021 WL 4464200, at *4 (C.D. Cal. June 23, 2021). The plaintiffs in *Hamman v. Cava Group, Inc.* likewise alleged the presence of "heightened levels of organic fluorine" in the defendant's grain and salad bowl products. *See* No. 22-CV-593-MMA, 2023 WL 3450654, at *5 (S.D. Cal. Feb. 8, 2023). As discussed above, the documents that are incorporated by reference establish that Plaintiffs have failed to plausibly allege that the presence of organic fluorine plausibly indicates the presence of PFAS or that the PFAS concentrations they detected through their organic fluorine testing exceed trace amounts or rise to a harmful level. *See Bodle v. Johnson & Johnson Consumer Inc.*, No. 21-CV-07742-EMC, 2022 WL 18495043, at *2 (N.D. Cal. Feb. 24, 2022) (finding causation allegations insufficient where the plaintiff alleged that the product at issue contained .13 parts per million of benzene, an amount "significantly less" than the .8 parts per mission linked to cancer).

In light of these pleading deficiencies, the Court **GRANTS** the motion to dismiss and does

not reach the remaining arguments P&G advances in its motion.

IV. **CONCLUSION**

For the reasons set forth above, P&G's motion to dismiss is **GRANTED IN PART AND DENIED IN PART WITH LEAVE TO AMEND**. Plaintiffs may file an amended complaint that cures the deficiencies discussed above within 21 days of this order. They may not add new claims or parties absent stipulation or leave of court.

**IT IS SO ORDERED.**

Dated: October 15, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**